DAVID MAYER, plaintiff in error, *vs.* GEORGE W. REED & Co., defendants in error.

NOTE.—This case was argued after the death of LUMPKIN, C. J., and before WARNER became C. J.

During the continuance of hostilities between the Confederate States and the United States, interest did not run in favor of a citizen of Pennsylvania, resident there, against a citizen of Georgia, resident here.

HARRIS, J.

After 13th July, 1861, interest did not run on such claims till the 10th of May, 1865.        WALKER, J.

Attachment. Judgment for interest accruing during the war. Decided by JUDGE WARNER. Fulton Superior Court, April Term, 1867.

This was an attachment returnable to April Term, 1867. It was founded upon three promissory notes, (the first for $692 37, dated 15th August, 1860, and due four months thereafter, the other two, each for $692 36, dated 31st August, 1860, and due four and five months after date, respectively, all payable to plaintiff's order, with exchange on Philadelphia,) and upon accounts for goods sold 31st August, 1860,

amounting to $2,209 20, and for goods sold 4th September, 1860, amounting to $158 17, bought by defendant on six months credit.

Defendant had notice of the attachment according to law, and appeared by counsel and defended it.   At the trial term, judgment was confessed for the principal debts, "with such interest, if any, as the Court may allow," with costs of suit. No distinction was made between the notes and open accounts.

The case was submitted to the consideration of the Court upon a written statement, as follows:

"Said defendant makes no other or further defense but "this:   He says that at the dates of the notes, and at the "dates of the purchases of the goods, plaintiffs were, and "ever since have been, citizens of Pennsylvania, United "States of America, and said defendant then was, and, until "the cessation of hostilities hereinafter mentioned, was a "citizen of, and resident in Atlanta, Georgia; that on the "19th day of January, 1861, Georgia passed what is known "as her secession ordinance; that she subsequently attached "herself to the so-salled Confederate States of America, "which recognized a war to exist between it and the United "States of America, on the 6th of May, 1861; that actual "hostilities did not exist between the United States and said "Confederate States, from that date till 10th May, 1865; "and that during the interval between the two dates last "named, said plaintiff had no agent in Georgia, authorized "to receive and receipt for money due said plaintiff; further "that the rate of interest of Pennsylvania was and is only "six per cent. *per annum;* and contends that no interest "should run during said interval.

BROWN & POPE, WEIL, Defendants' Attorneys.

"We admit all the foregoing without admitting that, if we "had had such agent in Georgia, defendant was able or "willing to pay said debts and accounts, and contend that he "is, notwithstanding, bound to plaintiffs for interest.

A. W. HAMMOND & SON, Plaintiff's Attorneys."

Mayer *vs.* Reed & Co.

The Court, after argument had, decided that interest, at the rate of six per cent. *per annum*, should be counted from the time when said several items fell due, up to the date of judgment, and defendants excepted. The Supreme Court (Judges Harris and Walker,) held up the case for consideration till December Term, 1867.

BROWN & POPE, SAMUEL WEIL, for plaintiff in error.

A. W. HAMMOND & SON, for defendants in error.

HARRIS, J.

A single question is presented by the record, and it is whether the plaintiffs below, citizens of Pennsylvania, can recover of defendant, a citizen of Georgia, interest upon the several notes sued on, accruing during the recent war between the States which remained in the Federal Union, and those which renounced it.

It is a settled principle of both municipal and international law, that the existence of war between States or Governments arrests all intercourse between the citizens or subjects of the respective belligerents, closes the Courts to all coercion by the creditor, prohibits the debtor, upon reasons of State policy, from paying his debts or obligations to the enemy creditor, however desirous he may be to maintain his credit or keep faith. The debtor dare not pay without license from the government to which he belongs; the creditor cannot receive, without similar license; after hostilities begun they stand towards each other as enemies, for that is the posture of their respective governments. That hostilities existed from April 1861, to April 1865, between Pennsylvania and Georgia, or in other words, between the States which remained in the Federal Union, and those which, by ordinances as sovereign States, separated themselves from that Union, is a "fixed fact" which will be difficult to deny, or forget, or change. It was not a civil war, in its legitimate sense; for that is a war between one portion of the citizens of a State with another portion, as was the case in the war begun in England in 1642,

and during the continuance of which Charles I was beheaded, or like the rebellion in the eighteenth century in behalf of his descendants. These were *insurrectionary* rebellions, and, in every sense, civil wars, *unauthorized* by the action of a State or its government. Georgia, a sovereign State, with other States South, stood upon her sovereignty, and engaged in war, and called her citizens to arms. Her act, as sovereign, was as distinct as that of Prussia or Austria. She was a belligerent as a State, in her entirety. To her, as such, attached all belligerent rights, and all nations and people are bound by a common law, among themselves, called the law of nations, to respect them. By the laws of war, Georgia's debtor citizen could not pay without committing a crime against the Confederacy, to which Georgia had united herself, and for paying could be punished. The logical result is, that during the continuance of hostilities, the right of the creditor was suspended, so that he could not receive; and as interest, when not directly contracted for and specified in the note, is, on principle, the fruit alone of detention of money beyond the time stipulated for payment, as compensation in damages to him from whom a debt has been *illegally* withheld, the creditor certainly cannot be permitted to recover for the term of hostilities, as by law he could neither receive nor the debtor pay.

To compel the Georgia debtor in this case to pay interest to the Pennsylvania creditor during the continuance of hostilities, can be done only on the assumption that the war in which the South was engaged was an insurrection, a rebellion on the part of a portion of its people against the rightful authority of its government. This is a profound error, and this is demonstrated by the undeniable fact that it was *a war between States.* Nothing can be more absurd than to apply to war made or carried on by Sovereign States, the terms of insurrection or rebellion.

The case under review was decided by Judge Warner, and was discussed before Judge Walker and myself, who unite in reversing the judgment below. Judge Walker places his

assent to a reversal solely upon an act of the Congress of the United States, forbidding intercourse between the belligerents.

Judgment reversed.

WALKER, J., concurring.

During the late civil war, did interest run on debts due by a citizen of Georgia to a citizen of Pennsylvania? In the case of the Georgia Insurance and Trust Company vs. Oliver, 1 Kelly's Rep., 38, this Court decided "that it is a general rule that persons who are prevented from paying over money by process of the Court, as summons of garnishment, writs of injunction and the like, are not liable for interest." In delivering the opinion, page 40, Judge Lumpkin says: "It would be unreasonable for the law to forbid a thing being done, and then to mulct the party in damages, in the assessment of interest, for not doing it; in other words, for not disobeying its own precept. The law works no such injustice—is chargeable with no such absurdity." See Osborn vs. Bank of the United States, 9 Wh. R., 837–8. By act of Congress of the United States, approved July 13, 1861, the United State's Statutes at Large, vol. 12, p. 257, upon the issuing of a proclamation by the President, declaring certain States in insurrection, all commercial intercourse between the citizens thereof and the citizens of the rest of the United States should cease and be unlawful, so long as such condition of hostility should continue; and all goods and chattels, wares and merchandise, coming from said States into the other parts of the United States, should be forfeited to the United States. In pursuance of said act of Congress, the President of the United States, on the 16th day of August, 1861, issued a proclamation, declaring that an insurrection then existed in Georgia, and all intercourse between her people and the people of that portion of the United States not declared to be in insurrection, was unlawful, and would remain unlawful until such insurrection should cease; and declaring all goods, etc., coming from Georgia into other parts of the United States, liable to forfeiture to the United

States. This was an injunction issued by the Legislative and Executive authority of the United States, prohibiting MAYER from paying REED & Co. this debt, and he would have disobeyed it at his peril. It was his duty to obey it, and having obeyed the law, it would be, in the language of our own Court, unreasonable for the law to mulct him in damages for not disobeying its own precept.

In addition to this, the Congress of the "Confederate States," by an act, approved 21st May, 1861, Statutes at Large, p. 151, passed an act prohibiting the citizens of the Southern States from paying to those of the United States any money due them, "pending the existing war waged by that government against the Confederate States." Without stopping to consider the effect of this enactment, which was sustained by a power that the individual citizens of the Southern States could not resist if they had tried, it may well be referred to as a reason why MAYER should not disobey the laws of the United States, and in doing so run counter to the laws of a power which for four years held at arms-length all the powers of the Government of the United States. Under such circumstances, to require MAYER to pay, or to mulct him in damages for not paying, is, to my mind, illegal and unjust. The law forbade his paying; he obeyed the law, and it is insisted he shall be punished for it. It is the duty of every good citizen to obey the laws, and for doing so, it would be oppressive in the extreme to exact interest from him.

The condition in which MAYER was placed is well described by the Supreme Court in the "Prize cases," 2 Black's Rep., 673. "In organizing this rebellion, they have *acted as States,* claiming to be sovereign over all persons and property within their respective limits, and asserting a right to absolve their citizens from their allegiance to the Federal Government. Several of these States have combined to form a new confederacy, claiming to be acknowledged by the world as a sovereign State. Their right to do so is now (1862) being decided by wager of battle. The ports and territories of each of these States are held in hostility to the General Government. It is no loose, unorganized insurrection, hav-

ing no defined boundary or possession. It has a boundary marked by lines of bayonets, and which can be crossed only by force. South of this line is enemy's territory, because it is claimed and held possession of by an organized, hostile and belligerent power. All persons residing within this territory, whose property may be used to increase the revenues of the hostile power, are, in this contest, liable to be treated as enemies, though not foreigners." Again, in "Mrs. Alexander's Cotton," 2 Wallace's Rep., 419. C. J. Chase says: "It is said that though remaining in rebel territory, Mrs. Alexander has no personal sympathy with the rebel cause, and that her property, therefore, cannot be regarded as enemy property; but this Court cannot enquire into the personal character and dispositions of individual inhabitants of enemy territory. We must be governed by the principle of public law, so often announced from this bench, as applicable alike to civil and international wars, that all the people of each State or District in insurrection against the United States, must be regarded as enemies, until, by the action of the Legislature and the Executive, or otherwise, that relation is thoroughly and permanently changed. * * * Being enemy's property, the cotton was liable to capture and confiscation by the adverse party." "Mrs. Alexander, being now a resident in enemy territory, and in law an enemy, can have no standing in any Court of the United States, so long as that relation shall exist," p. 421. In connection with the principles here enunciated, it was earnestly pressed upon this Court that the parties to this case occupied towards each other, during the war, the relation of alien enemies. Perhaps this conclusion may be difficult to resist, if C. J. Chase be right, when he says that the residents of the Southern States were, in law, enemies, and as such, could have no standing in any of the Courts of the United States. He does not say the parties were *alien* enemies, but he does say that the Southern people could not have a standing in the Courts of the United States, without regard to the personal disposition of the suitor. His residence fixed upon him the character of *enemy*. Counsel

Mayer *vs.* Reed & Co.

for MAYER relied with confidence on the case of Du Belloix vs. Lord Water, Park, 1 Dow'l. and Ry., p. 16, (16, E. C. L., 12.) In that case, Abbot, C. J., says : " There is another objection to the plaintiff's recovering interest on the debt, for during the greatest part of that time he was an alien enemy, and could not have recovered even the principal in this country, and, at all events, during that portion of the time the interest could not have run, and it would have been illegal to pay the bill whilst the plaintiff was an alien enemy." The view which I have taken of this case, renders it unnecessary to pass upon this authority. Having a ground upon which I can base my opinion, and one too, which seems to my mind so very clear, I prefer to rest it there, without entering into what would be a wide field for investigation, however inviting it may appear.

I have met with two decisions sustaining my view of this case. One is a decision made by Judge Giles, of the District Court of the United States, for the District of Maryland, in the case of Jackson Insurance Company vs. Stewart, reported in 6 vol., Am. Law Reg., p. 732. He holds, that " on a recovery by a citizen of Tennessee against a citizen of Maryland, after the close of the war, for a debt due before its commencement, no interest shall be allowed for the period covered by the war. This case also decides that the Statute of Limitations was suspended by the war. Judge Redfield appends to this case a note, in which he seems to concur in the points decided.

The other case is from the District Court of Appeals, of Virginia, First Judicial District, Tucker vs. Watson, *et al.,* reported in 6 Am. Law Reg., 220. In this case, Joyner, P. J., examines the question upon authority pretty elaborately, and decides that " commercial intercourse between parties in the Northern and Southern States, during the late rebellion, having been prohibited, both, by the general rules of public law, and expressly by the act of Congress, of July, 1861, and the President's proclamation in pursuance thereof, interest was suspended on debts due by persons in the territory of either belligerent to persons in the territory of the other."

This case has a reference to nearly all the American authorities on the subject, and they pretty uniformly sustain the decision then made. I am not aware that the identical question now presented has been determined by any Court of last resort in the United States.

The supreme power in the State had made it illegal for MAYER to pay this debt, and it would be contrary to all principles of right and justice to force him to pay a penalty for obeying the laws of his country. Upon this sole ground do I base my opinion in this case. The Judge in the Court below having held that interest ran in this case, during the war, in my opinion erred.

Judgment reversed.